**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ADIDAS AMERICA, INC., a Delaware corporation; ADIDAS AG; ADIDAS INTERNATIONAL MARKETING B.V., a foreign entity, *Plaintiffs-Appellees*, v. SKECHERS USA, INC., a Delaware corporation, *Defendant-Appellant*. | No. 16-35204 D.C. No. 3:15-cv-01741-HZ OPINION |

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted October 7, 2016
Portland, Oregon

Filed May 10, 2018

Before: Diarmuid F. O'Scannlain, Richard R. Clifton,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen;
Partial Concurrence and Partial Dissent by Judge Clifton

# SUMMARY[*]

## Lanham Act / Preliminary Injunction

The panel affirmed in part and reversed in part the district court's preliminary injunction prohibiting Skechers USA, Inc., from selling shoes that allegedly infringe and dilute adidas America, Inc.'s Stan Smith trade dress and Three-Stripe mark.

Affirming in part, the panel held that the district court did not abuse its discretion in issuing the preliminary injunction as to adidas's claim the Skechers's Onix shoe infringed on adidas's unregistered trade dress of its Stan Smith shoe. The panel concluded that adidas was likely to succeed on the merits of this claim because the trade dress was nonfunctional, the trade dress had acquired secondary meaning, and there was a substantial likelihood of confusion between the parties' products. In addition, the district court did not clearly err in finding a likelihood of irreparable harm to the Stan Smith.

Reversing in part, the panel held that the district court erred in issuing a preliminary injunction as to adidas's claim that Skechers's Cross Court shoe infringed and diluted its Three-Stripe mark. The panel held that the district court did not err in finding that adidas showed a likelihood of success on its trademark infringement and trademark dilution claims. Nonetheless, the district court abused its discretion in issuing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the preliminary injunction because adidas did not show that it would be irreparably harmed from sale of the Cross Court.

Concurring in part and dissenting in part, Judge Clifton wrote that the preliminary injunction should be affirmed in full. Judge Clifton disagreed with the majority's reversal of the preliminary injunction as to the Cross Court shoe on the ground that there was not evidence to support the district court's determination that adidas was likely to suffer irreparable injury.

## COUNSEL

Jonathan Hacker (argued), O'Melveny & Myers LLP, Washington, D.C.; Jordan Raphael, Jeffrey A. Barker, Mark A. Samuels, and Daniel M. Petrocelli, O'Melveny & Myers LLP, Los Angeles, California; for Defendant-Appellant.

Richard Charles Henn Jr. (argued) and Charles H. Hooker III, Kilpatrick Townsend & Stockton LLP, Atlanta, Georgia; Adam H. Charnes, Kilpatrick Townsend & Stockton LLP, Dallas, Texas; for Plaintiffs-Appellees.

## OPINION

NGUYEN, Circuit Judge:

Skechers USA, Inc. appeals the district court's issuance of a preliminary injunction prohibiting it from selling shoes that allegedly infringe and dilute adidas America, Inc.'s Stan Smith trade dress and Three-Stripe trademark. We hold that the district court did not abuse its discretion in issuing the preliminary injunction as to adidas's claim that Skechers's Onix shoe infringes on adidas's unregistered trade dress of its Stan Smith shoe. We conclude, however, that the district court erred in issuing a preliminary injunction as to adidas's claim that Skechers's Cross Court shoe infringes and dilutes its Three-Stripe mark. Accordingly, we affirm in part and reverse in part.

## I.

## FACTUAL BACKGROUND

adidas is a leading manufacturer of athletic apparel and footwear. Skechers is a footwear company that competes with adidas in the active footwear and apparel market. Skechers has grown to become the second largest footwear company in the United States, ahead of adidas and behind only Nike.

The Stan Smith has become one of adidas's most successful shoes in terms of sales and influence since its release in the 1970s. Deemed "[t]he favorite shoe of [fashion industry] insiders like designer Raf Simons and Marc Jacobs" by *The Wall Street Journal* and the "ultimate fashion shoe" by *i-D* magazine, the Stan Smith has received extensive media coverage and been featured in such print and online publications as *Time*, *Elle*, *InStyle*, and *Vogue*.

The Stan Smith also has frequently appeared on lists of the most important or influential sneakers of all time and has earned industry accolades such as *Footwear News*'s 2014 "Shoe of the Year." That same year, adidas announced that the Stan Smith had become its top-selling shoe of all time, selling more than 40 million pairs worldwide.

adidas is also known for its Three-Stripe mark, which has been featured on its products for many years as part of its branding strategy and for which it owns federal trademark registrations. adidas claims to earn several hundred million dollars in annual domestic sales of products bearing the Three-Stripe mark. adidas advertises the Three-Stripe mark in print publications, on television, and in digital media and promotes it through celebrity endorsements, sporting events sponsorships, and athletic partnerships.

The parties have a history of trademark litigation that has previously resulted in Skechers acknowledging that "adidas is the exclusive owner" of the Three-Stripe mark and agreeing not to use it or any other protected mark "confusingly similar thereto." Despite the agreement, adidas has sued Skechers several times in the last twenty years for infringement of its Three-Stripe trademark.[1]

---

[1] Skechers's unopposed motion for judicial notice is granted.

adidas filed the present lawsuit against Skechers on September 14, 2015, alleging, among other things, that Skechers's Onix shoe infringes on and dilutes the unregistered trade dress of adidas's Stan Smith shoe (both pictured below).

**The Stan Smith Trade Dress**



**The Skechers "Onix"**



adidas further alleges that Skechers's Relaxed Fit Cross Court TR (pictured below) infringes and dilutes adidas's Three-Stripe trademark, in violation of 15 U.S.C. § 1125(a), (c).



adidas filed a motion for preliminary injunction to prohibit Skechers from manufacturing, distributing, advertising, selling, or offering for sale the Onix and Cross Court. The district court granted adidas's motion and issued the preliminary injunction, finding that adidas established all the *Winter* factors. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

Skechers timely appealed.

## II.

## STANDARD OF REVIEW

We review the district court's issuance of a preliminary injunction for an abuse of discretion. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 876 (9th Cir. 2009). "A district court abuses its discretion in issuing a preliminary injunction if its decision is based on either an erroneous legal standard or clearly erroneous factual findings . . . ." *Negrete v. Allianz Life Ins. Co. of N.A.*, 523 F.3d 1091, 1096 (9th Cir. 2008). "The legal issues underlying the injunction are reviewed de novo because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000) (internal quotation marks omitted). By contrast, the district court's factual findings are reviewed for clear error. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1195–96 (9th Cir. 2009).

## III.

## ANALYSIS

Skechers contests only two of the factors under *Winter*, specifically, the district court's findings that adidas showed a likelihood of success on the merits and irreparable harm. Because the analysis for Skechers's Onix and Cross Court shoes differ, we take them each in turn.

### A.  Skechers's Onix and adidas's Stan Smith

#### i.   Likelihood of Success on the Merits

Skechers challenges the district court's finding that adidas demonstrated a likelihood of success on its claim that Skechers's Onix shoe infringes on and dilutes adidas's unregistered Stan Smith trade dress.

"Trade dress protection applies to 'a combination of any elements in which a product is presented to a buyer,' including the shape and design of a product." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:1 (4th ed. 2008)).[2] To prove infringement of an unregistered trade dress, "a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of

---

[2] adidas defines its Stan Smith trade dress as having: (1) "a classic tennis-shoe profile with a sleek white leather upper"; (2) "three rows of perforations in the pattern of" adidas's Three-Stripe mark; (3) "a defined stitching across the sides of each shoe," (4) "a raised mustache-shaped colored heel patch, which often is green"; and (5) "a flat tonal white rubber outsole."

confusion between the plaintiff's and defendant's products." *Id.* Skechers contests only the latter two elements.

A trade dress has acquired secondary meaning when consumers associate the design features with a particular producer. *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011) (citation omitted). "Secondary meaning and likelihood of buyer confusion are separate but related determinations . . . ." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir. 1980). Some of the relevant factors for determining secondary meaning include the exclusivity, manner, and length of use of the trade dress, the amount and manner of advertising, the amount of sales, and proof of intentional copying by the defendant. *Art Attacks*, 581 F.3d at 1145.

The district court's finding that the Stan Smith has likely acquired secondary meaning is supported by ample evidence in the record. The evidence showed that adidas has used the Stan Smith trade dress exclusively since the early 1970s, expended considerable capital and human resources to promote the shoe, and reaped significant but difficult-to-quantify value from placing the Stan Smith with celebrities, musicians, athletes, and other "influencers" to drive consumer hype and recognition of the trade dress—which, in 2014, became adidas's top selling shoe of all time with the 40 millionth pair sold. *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) (finding evidence of sales, promotional efforts, and duration of exclusive use indicative of secondary meaning). Also indicative of secondary meaning is the considerable amount of unsolicited media coverage praising the Stan Smith's influence and iconic status as one of the most famous sneakers of all time. *See Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350–51 (9th Cir. 1980) ("The district

court's finding that a secondary meaning has attached is supported by evidence of the extensive media coverage . . . .").

Skechers's own conduct also supports the district court's finding. "[P]roof of copying strongly supports an inference of secondary meaning." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989). Skechers placed metadata tags on its website that directed consumers who searched for "adidas Stan Smith" to the page for the Onix shoe. "Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999). We agree with the district court that "the only reason 'adidas Stan Smith' is a useful search term is that consumers associate the term with a distinctive and recognizable shoe made by adidas." Therefore, the district court did not clearly err by finding that the Stan Smith had acquired secondary meaning.

We turn next to the likelihood of confusion between the shoes. This factor turns on whether a reasonably prudent consumer would be confused about the source of the goods bearing the marks. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). "Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context[:] strength of the trade dress, similarity between plaintiff's and defendant's trade dress, evidence of actual confusion, marketing channels used, type of goods and likely degree of purchaser care, and the defendant's intent in selecting its trade dress." *Vision Sports*, 888 F.2d at 616 (internal citation omitted) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)). These are commonly referred to as the "*Sleekcraft* factors." We review the district court's

findings on these factors under the clearly erroneous standard. *Id.*

The first *Sleekcraft* factor is of considerable importance to the likelihood of confusion analysis, given that "the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com*, 202 F.3d at 1206. The similarities between the Stan Smith and Onix are unmistakable. Both shoes share the same white leather upper, a raised green mustache-shaped heel path, angled stripes with perforations, the identical defined stitching pattern around the perforations, and a flat white rubber outsole. Minor differences, including the use of Skechers's logo, do not negate the overall impression of similarity between these two shoes. *See Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001) ("[T]he issue is not whether defendant's package or trade dress is identical to plaintiff's in each and every particular. Rather, it is the similarity of the *total*, overall impression that is to be tested . . . ." (alterations in original) (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:2 (4th ed. 2000))).

Other *Sleekcraft* factors also favor adidas. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield Commc'ns*, 174 F.3d at 1055 (citing *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993)). "Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10 (internal quotation marks omitted). There can be little doubt that the shoes in question here are similar goods, and that, if the shoes were sold under the same mark, the public would reasonably think they came from the

same source. This makes the likelihood of confusion greater here than in other cases. And, as we discussed when analyzing the Stan Smith's secondary meaning above, adidas has presented ample evidence that the Stan Smith has enjoyed tremendous commercial success and market recognition. Finally, the evidence supports an inference that Skechers intended to confuse consumers; it not only created a nearly identical shoe to the Stan Smith, but then used metadata tags to direct consumers who searched for "adidas stan smith" to the Onix web page.[3]

"[O]nly a subset of the *Sleekcraft* factors are needed to reach a conclusion as to whether there is a likelihood of confusion." *GoTo.com*, 202 F.3d at 1206. Given the evidence, the district court here did not clearly err in concluding that adidas was likely to succeed on its claim that Skechers's Onix shoe infringes on adidas's Stan Smith trade dress.

---

[3] Relying on *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930 (9th Cir. 2015), Skechers argues that its use of metadata tags clearly identifying the source of the product being sold is indicative only of an intent *to compete*, not an intent to infringe. This reliance is misplaced. In *Multi Time*, a watch manufacturer brought an action alleging that an online retailer's listing of competitors' products in response to a search for the manufacturer's mark constituted trademark infringement. *Id.* at 934–35. Because the defendant there did not create any of the competing products, the use of the metadata was not probative of its intent to exploit the existing secondary meaning of a competitor's mark or trade dress. *Id.* at 936–37. Here, however, Skechers's use of the metadata is probative of its attempt to capitalize on the Stan Smith by both creating and selling the similar-looking Onix.

### ii.  Likelihood of Irreparable Harm

Skechers also argues that the district court's finding of a likelihood of irreparable harm to the Stan Smith was erroneous.

In *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, we reaffirmed that "[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm," so long as there is concrete evidence in the record of those things.  736 F.3d 1239, 1250 (9th Cir. 2013).  Consistent with *Herb Reed*, the district court here based its finding of irreparable harm from the Onix shoe on evidence that adidas was likely to suffer irreparable harm to its brand reputation and goodwill if the preliminary injunction did not issue.  adidas's Director of Sport Style Brand Marketing testified to the significant efforts his team invested in promoting the Stan Smith through specific and controlled avenues such as social media campaigns and product placement, and he stated that the Stan Smith earned significant media from various sources that was not initiated or solicited by adidas.  adidas also presented evidence regarding its efforts to carefully control the supply of Stan Smith shoes and its concerns about damage to the Stan Smith's reputation if the marketplace were flooded with similar shoes.  Finally, adidas produced customer surveys showing that approximately twenty percent of surveyed consumers believed Skechers's Onix was made by, approved by, or affiliated with adidas.[4]

---

[4] Skechers's intent to foment and capitalize on such confusion is evident from its use of the terms "adidas" and "Stan Smith" in its source code for the Onix shoe webpage.

The extensive and targeted advertising and unsolicited media, along with tight control of the supply of Stan Smiths, demonstrate that adidas has built a specific reputation around the Stan Smith with "intangible benefits." *See Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519 (9th Cir. 1984) (internal quotation marks omitted). And, the customer surveys demonstrate that those intangible benefits will be harmed if the Onix stays on the market because consumers will be confused about the source of the shoes. We find that the district court's finding of irreparable harm is not clearly erroneous. *See Herb Reed*, 736 F.3d at 1250; *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (noting that harm to advertising efforts and goodwill constitute "intangible injuries" that warrant injunctive protection).

## B. Skechers's Cross Court and adidas's Three-Stripe Mark

### i. Likelihood of Success on the Merits

adidas alleges that Skechers's Cross Court shoe infringes and dilutes its Three-Stripe trademark. The district court found that adidas showed a likelihood of success on the merits as to both the infringement and dilution claims.

### a. Trademark Infringement

To establish trademark infringement, a plaintiff must show, among other things, ownership of its trademark and a likelihood of confusion between its and the defendant's marks. 15 U.S.C. § 1125(a)(1)(A). Although Skechers concedes adidas's ownership of the Three-Stripe mark, Skechers challenges the district court's finding that adidas was likely to succeed in establishing the confusion element of its trademark infringement claim.

Given our deferential review, we cannot say the district court clearly erred in its analysis of the *Sleekcraft* factors. Both the Cross Court and adidas's designs have three stripes, and while there are distinctions between the marks—including a difference in the thickness of the stripes, the inclusion of a strip between the three stripes on the Cross Court, and the fact that the stripes do not continue to the sole of the shoe—the district court was permitted to discount these differences in conducting its factual determination regarding similarity. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010) (noting that "similarities are weighed more heavily than differences" in this analysis (internal quotation marks omitted)). This is especially true when the marks are attached to closely related products, as they are here. *See Goss*, 6 F.3d at 1392 (noting that a "diminished standard of similarity is therefore applied when comparing the marks of closely related goods"); *see also supra* Part III.A.i (discussing relatedness).

Nor did the district court clearly err in finding that the strength of the registered mark factor weighs in adidas's favor. "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (quoting *Brookfield Commc'ns*, 174 F.3d at 1058). "Two relevant measurements are conceptual strength and commercial strength." *Id.* "[A] mark's conceptual strength is proportional to the mark's distinctiveness." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005). "[A]n arbitrary or fanciful mark is the most distinctive." *Id.* (citing *GoTo.com*, 202 F.3d at 1207). On the other hand, "[c]ommercial strength is based on 'actual marketplace

recognition.'"  *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield Commc'ns*, 174 F.3d at 1058).  Evidence of substantial advertising expenditures can transform a suggestive mark into a strong mark.  *Id.*  The Three-Stripe mark possesses both conceptual and commercial strength. Conceptually, it features an arbitrary and distinctive design. Commercially, the mark enjoys a long history of marketplace recognition, as well as adidas's significant investment of resources to advertise the mark.

The district court also did not clearly err in finding that Skechers's intent in selecting its mark weighs in adidas's favor.  In light of the parties' litigation history, Skechers undoubtedly knew of adidas's Three-Stripe mark when it conceived of its Cross Court shoe.  "When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived."  *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (citing *Sleekcraft*, 599 F.2d at 354).  This knowledge supports the district court's finding that Skechers intended to deceive the public as to the source of its shoe by using a similar mark.

Taken together, we cannot say that the district court clearly erred in evaluating the *Sleekcraft* factors cited above in adidas's favor.[5]  Accordingly, we hold that the district

---

[5] Skechers argues that the use of its own logo on the Cross Court negates any confusion arising from its use of a similar three-striped mark.  But a trademark may not be freely appropriated so long as the user also includes its own logo.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980).  Whether the likelihood of confusion persists despite the presence of the alleged infringer's own logo is a question of fact, and the district court here did not clearly err in finding that Skechers's logo was not sufficiently prominent in comparison to the

court did not err in finding adidas showed a likelihood of success on its trademark infringement claim.

### b.  Trademark Dilution

"Dilution is 'the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.'" *Nissan Motor Co. v. Nissan Compt. Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004) (quoting 15 U.S.C. § 1127).  To establish dilution, "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008) (citing 15 U.S.C. § 1125(c)(1)).  "[T]he court may consider all relevant factors" to determine whether dilution is likely, including:

> (i)  The degree of similarity between the mark or trade name and the famous mark.

> (ii)  The degree of inherent or acquired distinctiveness of the famous mark.

---

three-striped mark to alleviate the likelihood of confusion.  *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989) (rejecting argument that sneaker label negated confusion because "the impressed words can only be read a few feet away from the eyes").

>   (iii)   The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

>   (iv)    The degree of recognition of the famous mark.

>   (v)     Whether the user of the mark or trade name intended to create an association with the famous mark.

>   (vi)    Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B).   No one factor is necessarily determinative. *See id.*; *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 207, 211 (2d Cir. 2013) (noting that "the importance of each factor will vary with the facts" and that "the test is not an inflexible one").

There is substantial overlap between many of these factors and the *Sleekcraft* factors.  In challenging the district court's determination that these factors weigh in favor of a likelihood of dilution, Skechers relies on many of the same objections it made to the district court's findings regarding a likelihood of success on the trademark infringement claim. We reject these arguments here for the same reasons we rejected them in the infringement context.  Skechers's only new argument is that adidas failed to produce evidence of the degree of recognition of the Three-Stripe mark, but this is simply incorrect.  There was substantial evidence from which the district court could find that the Three-Stripe mark enjoyed a high degree of recognition.  Accordingly, we hold

that the district court did not err in finding a likelihood of success on the merits on adidas's trademark dilution claim.

### ii.  Likelihood of Irreparable Harm

Skechers next argues that the district court abused its discretion in issuing the preliminary injunction because under *Winter*, adidas has not shown that it will be irreparably harmed from sale of the Cross Court.  We agree.

Both below and on appeal, adidas advanced only a narrow argument of irreparable harm as to the Cross Court: that Skechers harmed adidas's ability to control its brand image because consumers who see others wearing Cross Court shoes associate the allegedly lesser-quality Cross Courts with adidas and its Three-Stripe mark.[6]  Yet we find no evidence in the record that could support a finding of irreparable harm based on this loss of control theory.

First, adidas's theory of harm relies on the notion that adidas is viewed by consumers as a premium brand while Skechers is viewed as a lower-quality, discount brand.  But even if adidas presented evidence sufficient to show its efforts to cultivate a supposedly premium brand image for itself, adidas did not set forth evidence probative of

---

[6] While there are other ways post-sale confusion could hypothetically harm a trademark holder, *see, e.g.*, *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 358 (6th Cir. 2006); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:7 (5th ed. 2017), adidas has not raised any other theories of harm here.  Unlike the dissent, we hold adidas to its burden of showing a likelihood of irreparable harm on the theory that it actually raised.  *See* Dissent at 26–29 & n.2 (outlining how adidas *could have* suffered post-sale harm if the Skechers buyer could benefit from others believing she was wearing adidas shoes).

Skechers's allegedly less favorable reputation. The only evidence in the record regarding Skechers's reputation was testimony from adidas employees.[7]  First, adidas claimed that "Skechers generally sells its footwear at prices lower than adidas's"—how much lower, and for what of any number of possible reasons other than the quality of its products, we do not know.  This generalized statement regarding Skechers's price point does not indicate that consumers view Skechers as a value brand.  Second, one adidas employee noted that within adidas, Skechers is viewed as inferior to adidas.  Again, Skechers's reputation among the ranks of adidas employees does not indicate how the general consumer views it.  Thus, the district court's finding that Skechers is viewed as a "value brand" is an "unsupported and conclusory statement[]" that is not "grounded in any evidence or showing offered by [adidas]."

---

[7] Such employee testimony is hardly the most reliable evidence of the reputation of a competitor. *See Art Attacks Ink, LLC v. MGA Entm't*, 581 F.3d 1138, 1147 (9th Cir. 2009) (holding that a reasonable jury "could not have found actual confusion" between subject trademarks based on testimony of three of plaintiff's employees); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) (holding that declarations meant to rebut genericness of name "had little probative value regarding the assessment of consumer perception because they were from [plaintiff's] employees and wholesalers" and "[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases" (internal quotation marks omitted)).  However, we need not (and do not) rely on the diminished reliability of employee testimony here, where the testimony did not demonstrate that Skechers is a lower-value brand—one of the tenets of adidas's theory of irreparable harm—anyway.  Nor do we "disregard" it, as the dissent suggests, Dissent at 33–34; we merely disagree with the dissent about what the testimony actually shows.

*See Herb Reed*, 736 F.3d at 1250 (internal quotation marks omitted).**[8]**

Second, adidas's theory of harm is in tension with the theory of customer confusion that adidas has advanced to establish a likelihood of success on the merits.  adidas did not argue in the district court, and has not argued on appeal, that a Cross Court purchaser would mistakenly believe he had bought adidas shoes at the time of sale.  Indeed, this argument would be implausible because the Cross Court contains numerous Skechers logos and identifying features. Instead, adidas argues only that *after* the sale, *someone else* looking at a Cross Court shoe from afar or in passing might not notice the Skechers logos and thus might mistake it for an adidas.

The tension between adidas's consumer confusion and irreparable harm theories, then, boils down to this:  How would consumers who confused Cross Courts for adidas shoes be able to surmise, from afar, that those shoes were low quality?  If the "misled" consumers could not assess the

---

**[8]** The dissent criticizes our reliance on *Herb Reed*.  Dissent at 31–32.  True, there are more facts in the record here that adidas *claims* support a finding of likelihood of irreparable harm than there were in *Herb Reed*.  *See* 736 F.3d at 1250 (noting there was only one email in the record that might support an inference of irreparable harm).  The problem is that none of those facts *actually* support such a finding.  *Herb Reed* makes clear that it is the plaintiff's burden to put forth specific evidence from which the court can infer irreparable harm.  *See id.* ("The district court's analysis of irreparable harm is cursory and conclusory, rather than being grounded in any evidence or showing offered by [the plaintiff].").  Regardless of our deferential review, there must actually be such evidence in the record before we can uphold the district court's factual findings.  *Id.* (overturning the district court where its "pronouncements [were] grounded in platitudes rather than evidence"). We simply disagree with the dissent that there is any such evidence supporting adidas's theory of irreparable harm on this record.

quality of the shoe from afar, why would they think any differently about adidas's products?  How could adidas's "premium" brand possibly be hurt by any confusion?

Indeed, such a claim is counterintuitive.  If a consumer viewed a shoe from such a distance that she could not notice its Skechers logos, it is unlikely she would be able to reasonably assess the quality of the shoes.  And the consumer could not conflate adidas's brand with Skechers's supposedly "discount" reputation if she did not know the price of the shoe and was too far away to tell whether the shoe might be a Skechers to begin with.  In short, even if Skechers does make inferior products (or even if consumers tend to think so), there is no evidence that adidas's theory of post-sale confusion would cause consumers to associate such lesser-quality products with adidas.  And, even if we agree with the district court that some consumers are likely to be confused as to the maker of the Cross Court shoe, we cannot simply assume that such confusion will cause adidas irreparable harm where, as here, adidas has failed to provide concrete evidence that it will.  *See Herb Reed*, 736 F.3d at 1250–51.

As discussed above, adidas presented specific evidence that its reputation and goodwill were likely to be irreparably harmed by Skechers's Onix shoe based on adidas's extensive marketing efforts for the Stan Smith and its careful control of the supply of Stan Smiths available for purchase.  Thus, even post-sale confusion of consumers from afar threatens to harm the value adidas derives from the scarcity and exclusivity of the Stan Smith brand.  But there was no comparable argument or evidence for the Cross Court.

Because adidas failed to produce evidence that it will suffer irreparable harm due to the Cross Court, we conclude that the district court abused its discretion by issuing a

preliminary injunction for the Cross Court.  *See Herb Reed*, 736 F.3d at 1250.

* * *

We affirm the district court's preliminary injunction order as to the Onix shoe as likely infringing on, and causing irreparable harm to, adidas's Stan Smith trade dress. However, because we find that there was no evidence in the record that met the standard outlined in *Herb Reed* for likelihood of irreparable harm to adidas's Three-Stripe mark, we reverse the preliminary injunction as to the Cross Court shoe.  The parties should bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART.**

CLIFTON, Circuit Judge, concurring in part and dissenting in part:

The preliminary injunction entered by the district court should be affirmed in full.  I join with my colleagues in affirming the preliminary injunction regarding Skechers's Onix shoe based on its infringement on the trade dress of adidas's Stan Smith shoe and concur in that part of the majority opinion.

Where I part ways with the majority concerns the infringement by Skechers with its Cross Court shoe of the Three-Stripe mark owned by adidas.  The majority holds that adidas has demonstrated a likelihood of success on the merits of that claim, sufficiently demonstrating both trademark infringement and trademark dilution, and I agree. Nonetheless, the majority reverses the preliminary injunction as to the Cross Court shoe on the ground that there

was not evidence to support the district court's determination that adidas was likely to suffer irreparable injury. As to that, I disagree. In my view, the majority opinion misunderstands our precedent, misperceives the means by which adidas will suffer irreparable injury, and mischaracterizes the evidence before the district court. As a result, I must, in part, respectfully dissent.

## I.  Herb Reed

The precedent relied upon by the part of the majority decision in question comes down essentially to a single case, *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013). That case involved the "The Platters," the legendary vocal group that produced dozens of hits in the 1950s.[1] The band broke up in the 1960s and "each member continued to perform under some derivation of the name 'The Platters.'" *Id*. at 1242. Litigation followed, described in that opinion, from which Herb Reed Enterprises emerged as the legal owner of "The Platters" name. (Herb Reed was one of the founders of the original group.) Decades later, Herb Reed Enterprises sought to prevent the use of that name by another vocal group. The district court granted a preliminary injunction in favor of Herb Reed, which this court reversed. We concluded that the record supported the district court's determination that Herb Reed was likely to succeed on the merits of its trademark claim, but that the record did not support the finding of a likelihood that Herb Reed

---

[1] As noted in our opinion, The Platters put 40 singles on the Billboard Hot 100 List, including "Great Pretender," "Smoke Gets In Your Eyes," "Only You," and "To Each His Own." *Herb Reed*, 736 F.3d at 1242.

Enterprises suffered irreparable harm as a result of the trademark infringement.

Our decision noted that the legal rule previously was that "irreparable injury may be *presumed* from a showing of likelihood of success on the merits of a trademark infringement claim." *Id*. at 1248–49 (emphasis in *Herb Reed*) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999)). Subsequent Supreme Court decisions undermined that presumption, however, and in *Herb Reed* we held that a plaintiff could not simply rely on that presumption but must establish irreparable harm in order to obtain an injunction. We went on to reverse the preliminary injunction that had been entered by the district court, noting that the finding of irreparable harm was not "grounded in *any* evidence or showing offered by" the plaintiff. *Id.* at 1250 (emphasis added). We emphasized that "missing from this record is *any* such evidence." *Id*. (emphasis added).

The argument by the *Herb Reed* plaintiff, as expressed by the district court in that case, was "the harm to Reed's reputation caused by a different unauthorized Platters group warranted a preliminary injunction." *Id*. (quoting from the district court order). This court "comb[ed] the record" and came up with only "an email from a potential customer complaining to [the appellants'] booking agent that the customer wanted Herb Reed's band rather than another tribute band," which we concluded "simply underscores customer confusion, not irreparable harm." *Id*. There was, we concluded, no evidence at all to support the proposition that Reed's reputation had been harmed. Importantly, the factual circumstances did not provide support for such an inference. More than a half century after the real Platters broke up, a legal claim to the name did not itself differentiate

among the reputations of different tribute bands claiming tenuous connections with the original Platters through different performers. If the group that licensed the name from Herb Reed Enterprises could prove that it lost bookings as a result, it could claim damages, of course, but we saw no support for a finding that the reputation of the group associated with Herb Reed Enterprises had been injured.

Our decision in *Herb Reed* did not disclaim the logic that led to the creation of the now-discarded legal presumption, however. It is not hard to understand how the presumption arose. If a plaintiff can demonstrate a likelihood that it will succeed on the merits of its trademark claim—as adidas succeeded in establishing that Skechers's Cross Court shoe infringed and diluted adidas's famous Three-Stripe mark, a conclusion we affirm—it is not a big leap to conclude that adidas would be injured by that action. The inference might not always follow, as the facts in *Herb Reed* illustrate. That one Platters tribute band might be mistaken for another did not necessarily establish that the band that had a legal right to the name suffered an injury to its reputation. But in other circumstances, including those here, the inference of injury is logical. As the Third Circuit observed in affirming a similar preliminary injunction: "Although we no longer apply a presumption, the logic underlying the presumption can, and does, inform how we exercise our equitable discretion in this particular case." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 n.8 (3d Cir. 2014). Our decision in *Herb Reed* did not change that.

## II. Irreparable Injury

The district court found that adidas likely suffered harm as the result of post-sale confusion. The theory of post-sale confusion in the trademark context provides that "consumers could acquire the prestige value of the senior user's product

by buying the copier's cheap imitation," and that, "[e]ven though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:7 (5th ed. 2018). "Thus, the senior user suffers a loss of sales diverted to the junior user, the same as if the actual buyer were confused." *Id.* In other words, sale of the Cross Court, which infringed and diluted adidas's Three-Stripe trademark, would result in post-sale confusion and harm adidas, the trademark holder, by threatening to divert potential customers who can obtain the prestige of its goods without paying its normal prices.[2] *See Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.*, 428 F. Supp. 689, 694 n.10 (N.D. Ga. 1976) (regarding grill and hood ornament kit meant to make a Volkswagon look like a Rolls-Royce).

Post-sale confusion accounts for consumers who buy imitations of a prestigious senior holder's brand at lower prices in the very hope that others will confuse their products as being manufactured by the senior holder. About thirty years ago, when I was in private practice, my law firm was retained by Louis Vuitton to combat the sale of cheaper imitations. Some were counterfeits, reproducing the distinctive "LV" mark and pattern on bags similar to those actually sold by Louis Vuitton. Others were knock-offs, such as bags with a similar looking "LW" mark or products that Louis Vuitton probably wouldn't dream of making, such as baseball caps covered with dozens of "LV" marks. Many

---

[2] Diversion of customers is a form of irreparable harm. *See* McCarthy, *supra*, § 30:47 ("confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult"); *see also*, *e.g.*, *China Cent. Television v. Create New Tech. (HK) Ltd.*, 2015 WL 12732432, at *20 (C.D. Cal. Dec. 7, 2015).

of the items were sold at locations, like swap meets and flea markets, where few would expect to find real Louis Vuitton products. Prices were often a tiny fraction of what the real thing cost, and it was unlikely that the purchasers thought that they were walking away with genuine Louis Vuitton merchandise. Leaving the legal arguments aside, it wasn't a surprise to me (and still isn't) that Louis Vuitton was concerned and was willing to expend considerable effort to protect its trademark. As Professor McCarthy described, if the prestige of carrying a bag with the Louis Vuitton trademark could be obtained at a fraction of the price, and if viewers could not tell the difference, the value of the trademark would be in jeopardy. And, if someone did confuse the cheap imitation for the real thing, the lesser quality of the imitator could further imperil the perceived value of the Louis Vuitton products and trademark.

The Three-Stripe mark owned by adidas is one of the most famous marks in the world. There is evidence in the record that it has been heavily advertised and promoted by adidas for many years, at the cost of millions of dollars each year. adidas sells several hundred million dollars worth of products bearing the Three-Stripe mark each year in the United States and billions of dollars globally. The Three-Stripe mark is the subject of multiple trademark registrations, in this country and others. adidas has worked to protect its mark, including through litigation against Skechers, and Skechers has acknowledged, as the majority opinion notes, at 3, that adidas is the exclusive owner of the Three-Stripe mark and agreed not to use it or any confusingly similar mark.

That adidas is concerned about the impact of trademark infringement and dilution on the Three-Stripe mark, like Louis Vuitton was, is obvious. The reasons seem pretty

obvious to me as well. If a shoe bearing a mark that looks like the Three Stripes cannot reliably be identified as being an adidas shoe, available at adidas prices, and made to satisfy the quality standards of adidas, then that Three-Stripe mark will lose some of its value and adidas will be harmed.

The majority opinion describes this as "counterintuitive." Maj. Op. at 22. It seems logical to me, and it is well established in the law as a basis for a claim of dilution.

The majority opinion attempts to justify its constrained consideration of the post-sale confusion harm suffered by adidas on the premise that adidas "advanced only a narrow argument of irreparable harm" as to the Skechers shoe that infringed on the Three-Stripe mark, the Cross Court shoe. *Id.* at 19. The majority describes the argument as follows: "that Skechers harmed adidas's ability to control its brand image because consumers who see others wearing Cross Court shoes associate the allegedly lesser-quality Cross Courts with adidas and its Three-Stripe mark." *Id.*[3]

That argument is actually not so narrow. It is remarkably similar to the explanation provided by Professor McCarthy, as quoted above, at 26–27, that the majority opinion claims that adidas did not make: that "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation," and that, "[e]ven though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused." McCarthy, *supra*, § 23:7. It is also consistent with the definition of "dilution" applied by

---

[3] As discussed below, at 37–38, the majority is wrong in concluding that adidas's dilution claim depends upon establishing that Skechers is perceived as a lesser-quality brand.

the district court in its preliminary injunction order: "'the lessening of the capacity of a famous mark to identify and distinguish goods or services' of the owner of the famous mark such that the strong identification value of the owner's trademark whittles away or is gradually attenuated as a result of its use by another." (Quoting *adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1060 (D. Or. 2008) (quoting *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (quoting 15 U.S.C. § 1127)).)

The district court went on to observe that "[t]here are two types of dilution: by blurring and by tarnishment." Tarnishment appears to be the only argument the majority considers. The district court described that form of dilution: "a famous mark is considered diluted by tarnishment when the reputation of the famous mark is harmed by the association resulting from the use of the similar mark." But the district court's order described the blurring form of dilution as well, recognizing it as part of adidas's claim, and defining it as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." The district court found that adidas has offered sufficient proof to support a blurring claim. It specifically found that "Skechers' infringement undermines adidas's substantial investment in building its brand and the reputation of its trademarks and trade dress" and that "Skechers' attempts to 'piggy back' off of adidas's efforts by copying or closely imitating adidas's marks means adidas loses control over its trademarks, reputation, and goodwill." There was nothing counterintuitive or narrow about the dilution claim presented by adidas and found persuasive by the district court.

## III.     Standard of Review

Before getting to a discussion of the evidence, I note that the majority appears to ignore the proper standard of review. Although the majority opinion correctly identifies clear error as the standard of review that applies to the district court's factual determinations, Maj. Op. at 7, it does not actually refer to or apply that standard in rejecting the finding of the district court that adidas had produced "sufficient evidence of irreparable harm."   The failure to apply the proper standard makes it easier for the majority to substitute its own evaluation of the evidence for that of the district court.  That is not our role.

## IV.     Evidence

*Herb Reed* faulted the plaintiff in that case for not producing "any" evidence in support of its claim of irreparable injury, as noted above, at 25.  The majority apparently concludes the same to be true here.  *See* Maj. Op. at 21 n.8, 22–23.

The district court was aware of *Herb Reed*.  Its order cited and quoted from our decision in that case: "In trademark cases, although '[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm,' a court making a finding of irreparable harm must ground its analysis in evidence rather than conclusory assertions or speculation." (Quoting *Sleash, LLC v. One Pet Planet, LLC*, 2014 WL 4059163, at *6 (D. Or. Aug. 15, 2014) (quoting *Herb Reed*, 736 F.3d at 1250).)  Yet the majority opinion neither acknowledges that the district court cited the relevant precedent nor references the four pages in the district court's order devoted to its discussion of irreparable harm.

adidas, in contrast to the appellee in *Herb Reed*, provided ample evidence of this harm.  The record includes the sworn declarations and live testimony by several adidas employees, including marketing executives.  These employees testified that adidas has, over decades, established a reputation for itself as a premium sports brand, whereas Skechers's brand perception is as a "value brand" or "lower-end brand."  They also testified to the particular steps regarding investments in advertising, promotion, and quality control that adidas has taken to achieve and maintain this positive reputation.  These steps include taking special care to ensure that the Three-Stripe mark is always prevalent, whether on a shoe or in a retail location.  In addition, adidas spends millions each year on promotions and brand advertising on television, in print publications, and via digital media; sponsorships of sporting events such as the FIFA World Cup and Boston Marathon; college sports programs like those at Arizona State, Miami, Nebraska, and Texas A&M; teams such as the Manchester United Football Club and the French national basketball team; professional sports leagues such as Major League Soccer; and individual professional athletes like NBA player James Harden and MLB player Kris Bryant.  adidas also uses "influencer marketing," and works with celebrities like Kanye West and Pharrell Williams to ensure that they promote the adidas brand to their fans and followers.

Skechers did not rebut adidas's evidence of the brands' respective reputations, failing to cross-examine the adidas employees on these issues or to provide any counter evidence of its own.  Nor did it submit any evidence denying the efforts of adidas to promote and protect the Three-Stripe mark or the sales of adidas products bearing the Three-Stripe mark.  The majority opinion does not explain why the evidence of the substantial efforts of adidas to promote its brand and its Three-Stripe mark was insufficient.  Nor does

it explain why those efforts do not distinguish this case from the factual setting of *Herb Reed*, where the plaintiff failed to produce "any" evidence.

The majority asserts that it has not disregarded the evidence presented by adidas and relied upon by the district court, contending that it "simply disagree[s] with the dissent that there is any such evidence supporting adidas's theory of irreparable harm on this record." Maj. Op. at 21 n.8. But as described above, and as will be further described below, there was lots of evidence to that effect. In a footnote, the majority opinion acknowledges that there were factual assertions supported by the record but asserts that none of those facts "*actually* support" the district court's finding. *Id.* (emphasis in original). The district court found differently, however, and nowhere does the majority explain what was clearly erroneous about the findings of the district court, let alone why the evidence presented by adidas fell short.

To the extent that it offers an explanation, the majority criticizes adidas's showing by asserting that "[t]he only evidence in the record regarding Skechers's reputation was testimony from adidas employees" and that "employee testimony is hardly the most reliable evidence." *Id.* at 20 & n.7. It further denigrates that evidence by remarking that "Skechers's reputation among the ranks of adidas employees does not indicate how the general consumer views it." *Id.* at 20. To begin with, the majority further illustrates by those words that there was evidence in the record supporting adidas's contentions. The majority has elected to discount that evidence, by applying its own skepticism toward employee testimony. But the district court concluded that the evidence was reliable. The majority simply substituted its own view of the evidence to disregard it. That is not our function as a court of appeals.

The majority cites no authority to support the proposition that a preliminary injunction can be based only on the "most reliable" evidence.  That is not the law.  To the contrary, *Herb Reed* recognized that for a preliminary injunction, courts may even consider evidence that would normally be inadmissible.  *See* 736 F.3d at 1248–50 & n.5.[4]

More broadly, the notion that the court of appeals can decide for itself that evidence relied upon by the district court should be ignored because it was provided by an employee of a party is both unsupported and badly misguided.  Almost every case involves testimony by a witness who has a self-interest.  We do not automatically disregard such evidence.  The district court, like any trier of fact, could take that into account, and it could have decided that the evidence was not reliable.  In this case, however, it concluded that the evidence was reliable.  There was nothing clearly erroneous about doing so, and no legal rule supports the majority's rejection of the district court's finding.

Indeed, this court recently affirmed a preliminary injunction that relied on similar evidence by an employee of one of the parties.  In *Disney Enterprises, Inc. v. VidAngel, Inc.*, we held that the evidence—the unrebutted declaration of an employee of one of the plaintiffs which stated that the defendant's infringement interfered with their right to control how consumers viewed the plaintiffs' copyrighted works—was sufficient to establish the likelihood of

---

[4] The cases cited in the majority opinion are easily distinguishable. *See* Maj. Op. at 20 n.7.  *Art Attacks Ink, LLC v. MGA Entm't*, 581 F.3d 1138, 1147 (9th Cir. 2009), was an appeal of a jury verdict, and the appellant in *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902 (9th Cir. 1995), challenged the dissolution of a preliminary injunction that the district court based upon its invalidation of claimed trade names and marks.

irreparable harm. 869 F.3d 848, 865–66 (9th Cir. 2017). The defendant there made essentially the same argument that the majority makes here, "that once the district court concluded the [plaintiffs] were likely to succeed on their copyright infringement claim, it relied on a forbidden presumption of harm rather than 'actual evidence.'" *Id.* at 866. However, the district court rejected this contention, and found that the sworn testimony of the plaintiffs' employee, even without corroborating evidence, was sufficient evidence of irreparable harm. *Id.* Our court's decision, affirming the district court, concluded that *Herb Reed* permitted the district court to rely on such evidence to find irreparable harm. The decision of the majority in this case to disregard employee evidence conflicts with our precedent.

The majority attempts to back away from the implications of its negative characterization of the evidence provided by adidas employees, by denying in a footnote that it relies on what it calls the "diminished reliability of employee testimony here." Maj. Op. at 20 n.7. But, tellingly, its statement to that effect in a footnote does not withdraw the denigration of that testimony in the text of its opinion. And if that evidence is not discounted based on its source, it is unclear how the majority can assert, as it does on 21 n.8, that there is no evidence in the record supporting adidas's theory of irreparable harm.

Besides, the majority is factually wrong about the source and substance of the evidence in the record. It was not just "testimony from adidas employees" regarding "Skechers's reputation among the ranks of adidas employees." A marketing professional has to be knowledgeable about consumer perceptions of his own brand, in this case adidas, and also of competitors, including Skechers. The evidence presented by adidas included evidence of what *customers*

thought.   The record shows that adidas employees, as a normal part of their jobs, obtained and reviewed focus group research to understand "retail and consumer perceptions" of adidas products.  *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (holding that witnesses' personal knowledge may be "inferred from their positions and the nature of their participation in the matters to which they swore").    The evidence included testimony that consumers as well as adidas viewed Skechers as a lower end value brand: "Where *our consumer* and, in my opinion, where we see Skechers is a lower end value brand." (Emphasis added.)   Contrary to the characterization in the majority opinion, that statement expressed more than a statement by adidas employees of their personal opinions regarding Skechers's reputation.

The record also includes evidence that adidas products were generally priced above comparable Skechers products. There was testimony by an adidas employee that "Skechers generally sells its footwear at prices lower than adidas's."  It would be expected that a company would be aware of relative pricing by competitors.  Skechers never disputed the competence of that testimony or provided evidence to the contrary.  Beyond that, the record also contains evidence that specific adidas products sold at higher prices than their alleged Skechers's counterparts.  For example, the record contains proof that the standard version of the adidas Stan Smith retailed between $85 to $75, whereas the Skechers Onix was priced at $65.  The adidas Supernova was priced between $130 to $95, whereas the Skechers Supernova was $70.  There is no reason why this evidence of the prices of other shoes could not be relied upon by the district court to corroborate the statement by adidas's employee that Skechers generally sold its shoes at a lower price.  Again,

Skechers did not contest the relative prices of the brands' shoes, leaving the evidence of its lower pricing unrebutted.

In sum, based on the record before it, the district court was well within its discretion to infer that confusion between Skechers's "lower-end" footwear and adidas's footwear was likely to harm adidas's reputation and goodwill as a premium shoe brand. This is precisely the type of harm that is "irreparable" insofar as it cannot be adequately compensated for by money damages. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). It was simply not the case, as the majority opinion asserts, that "the testimony did not demonstrate that Skechers is a lower-value brand." Maj. Op. at 20 n.7. The findings by the district court were not clearly erroneous.

Finally, the district court's determination did not even depend on adidas's testimony regarding Skechers's reputation as a lower quality brand. The premise of the majority opinion that adidas had to establish that difference in reputation, stated multiple times, *see, e.g.*, Maj. Op. at 20 & n.7, is wrong. Instead, the loss by adidas of control over its mark was by itself irreparably harmful. "A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. Without quality control, this message is false because without control of quality, the goods or services are not truly 'genuine.'" 1 *McCarthy on Trademarks and Unfair Competition* § 3:11 (5th ed. 2018). "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. . . . For this purpose the actual quality of the goods is irrelevant: it is the control of quality that a

trademark holder is entitled to maintain." *Id.* (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)). Accordingly, irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark. *See, e.g.*, *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010) (explaining that a plaintiff who loses "the ability to control its brand image and reputation" loses an "intangible, but valuable . . . asset[]."). There was substantial evidence in the record regarding the value of adidas's mark and its management of the mark through investment and quality control over its products. Though the majority ignores that evidence, it was there and could properly be relied upon by the district court to support its finding of irreparable harm.

## V.  Conclusion

In reviewing a preliminary injunction, the scope of our review "is limited and deferential." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (citation omitted). *Herb Reed* reiterated that "limited and deferential" standard. 736 F.3d at 1247 (citation omitted). Moreover, *Herb Reed* instructed us to afford district courts wide discretion to make a finding when there is supporting evidence, and acknowledged that, "we will reverse only if the court's decision resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id*. (internal quotation marks omitted). Based upon the record and adidas's unrebutted evidence, it is clear to me that the district court did not abuse its discretion, and that the preliminary injunction should be affirmed in full. I respectfully dissent.