**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JASON SCOTT COLLECTION, INC., an Arizona corporation,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>TRENDILY FURNITURE, LLC, a Texas limited liability company; TRENDILY HOME COLLECTION, LLC, a Texas limited liability company; RAHUL MALHOTRA, an individual,<br>*Defendants-Appellants.* | No. 21-16978<br><br>D.C. No. 2:17-cv-02712-JJT<br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted December 5, 2022
Phoenix, Arizona

Filed May 30, 2023

Before: Kim McLane Wardlaw and Patrick J. Bumatay, Circuit Judges, and Karen E. Schreier,[*] District Judge.

---

[*] The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, sitting by designation.

Opinion by Judge Wardlaw

## SUMMARY[**]

### Lanham Act

In a case in which defendants Trendily Furniture, LLC, Trendily Home Collection, LLC, and Raul Malhotra (collectively, "Trendily") intentionally copied three unique high-end furniture designs by plaintiff Jason Scott Collection (JSC) and sold nearly identical pieces to Texas retailers, the panel affirmed the district court's decision, following a bench trial, holding Trendily liable on trade dress infringement claims and awarding attorney's fees.

Trendily did not challenge on appeal the district court's summary judgment to JSC on its copyright claim.

To obtain a judgment for trade dress infringement under the Lanham Act, a plaintiff must prove: (1) that its claimed trade dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion.

Because the parties stipulated to nonfunctionality, the district court relied upon that stipulation at trial, and Trendily did not provide a good reason for disregarding that

_____

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

stipulation, the panel accepted that JSC's claimed trade dress is nonfunctional.

Because the parties also stipulated that JSC's trade dress is not inherently distinctive, JSC needed to prove its trade dress has secondary meaning. The panel held that the district court did not clearly err in finding that JSC did so. The panel wrote that Trendily's clear intent to copy nonfunctional features of JSC's pieces supports a strong inference of secondary meaning. Noting that copyright and trademark are not mutually exclusive, the panel rejected Trendily's argument that it should be held liable only under the Copyright Act. The panel held that the district court properly considered several other factors including that the JSC pieces were continuously manufactured and sold since 2004, that JSC had a longstanding and well-known presence in the high-end furniture market, and that JSC's furniture was distinctive in the minds of purchasers. The panel explained that even if it were to disregard JSC's evidence of retailer confusion, that evidence is not necessary for JSC to establish secondary meaning, and direct proof of end-consumer confusion is not required. Instead, the district court relied on proof of copying and a substantial amount of indirect evidence indicating that JSC's work was recognizable by both retailers and consumers in the high-end furniture market, as well as advertisements. The panel wrote that finding secondary meaning on this basis was not error, and that the district court's reliance on retailer confusion was appropriate in this market. Rejecting Trendily's argument that product designs can never be distinctive, the panel explained that a design is still protectable if it acquires secondary meaning.

The panel held that the district court did not err in finding that there was a likelihood of confusion between the JSC

pieces and the Trendily pieces. Considering similarity, proximity, and retailer confusion, the panel held that because the products and marketing channels of the parties were nearly identical, the district court did not err in its likelihood of confusion finding.

Turning to remedies, Trendily challenged the district court's decision to award reasonably foreseeable damages to JSC based on its changed relationship with retailer Coyote Candle. The panel wrote that there is some flexibility in assessing reasonable foreseeability under the Lanham Act, and that damaged business relationships are a foreseeable consequence of trademark infringement. Given the broad discretion and the plausible causal relationship between Trendily's actions and the loss of Coyote Candle's business, the panel concluded that the district court did not abuse its wide discretion when it found that JSC suffered a compensable harm. The panel held that the district court did not abuse its discretion in awarding $132,747 of lost annual profits from Coyote Candle over a period of three years, which amounts to six times the $19,995 in profits JSC was awarded for its copyright claim. The panel explained that the copyright damages were based on Trendily's *retrospective* gross profits from the infringement, while the trade dress damages were based on JSC's *prospective* lost profits.

The panel held that the district court correctly awarded attorneys' fees, as it did not abuse its discretion in concluding that Trendily's willful and brazen infringement, paired with the strength of JSC's trade dress claim, constitutes an exceptional case. The panel awarded JSC attorneys' fees on appeal, referring determination of the appropriate amount to the Appellate Commissioner.

## COUNSEL

Leighton M. Anderson (argued), Bewley Lassleben & Miller LLP, Whittier, California, for Defendants-Appellants.

Thomas Dietrich (argued), Dietrich IP PLLC, Tucson, Arizona, for Plaintiff-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Appellee Jason Scott Collection, Inc. (JSC) and Appellants Trendily Furniture, LLC, Trendily Home Collection, LLC and Rahul Malhotra (collectively, "Trendily") are high-end furniture manufacturers that sell their products in the Texas market.  In 2016, Trendily intentionally copied three unique furniture designs by JSC and sold them to Texas retailers.  The district court granted summary judgment to JSC on its copyright claim, and then held Trendily liable on the trade dress claim following a bench trial.  On appeal, Trendily challenges only the latter ruling, arguing that trade dress liability is precluded here because JSC did not demonstrate either secondary meaning or the likelihood of consumer confusion.  Because the district court did not clearly err in finding JSC's pieces had acquired secondary meaning and created a likelihood of confusion, and did not abuse its discretion in awarding damages and attorneys' fees, we affirm.

## I.

In 1998, designer Jason Scott Forsberg (Jason Scott) started creating hand-carved furniture out of reclaimed teak in a small village in Indonesia.  So began what JSC refers to as the "Jason Scott story": Jason Scott worked with local wood carvers to craft his pieces, and JSC eventually became the village's largest employer.  He was strongly connected to the village community, as he helped fund a school, helped provide electricity, and started his family there.

Jason Scott's first furniture collection—aptly titled the "Jason Scott Collection"—featured large, heavy-set pieces of furniture embellished with detailed wood carvings and metal designs.  In 2003, Jason Scott designed the three pieces in the Collection that are now at issue in this case: the Sacred Heart Table (Figure 1), the Iron Star Desk (Figure 3), and the Borgota Buffet (Figure 5) (collectively, the "JSC Pieces"). *See* Appendix A.

Because Texas is JSC's largest market, and Trendily's furniture manufacturing business is based in Dallas, Trendily and JSC compete in the Texas high-end furniture market.  In September 2016, Rahul Malhotra, Trendily's owner and operator, met with Ron McBee, the owner of retailer Western Heritage Furniture in Weatherford.  During their meeting, McBee gave Malhotra printed photographs of the JSC Pieces and asked him to manufacture similar pieces for Western Heritage.  Malhotra sent the photographs to Trendily's factory and directed carpenters to build the "M.J. Collection," a set of nearly identical imitations of the JSC Pieces comprised of the M.J. Dining Table (Figure 2), the M.J. Desk (Figure 4), and the M.J. Sideboard (Figure 6) (collectively, the "Trendily Pieces").  *See* Appendix A.

Since 2004, JSC has sold its pieces exclusively to authorized retailers.  Under these exclusivity agreements, JSC agrees to restrict supply of its pieces to a single store within a certain radius, and the retailer agrees to restrict sales to end-consumers.  Sally Brumbaugh is a co-owner of Fort Worth retailer Brumbaugh's Furniture, which has an exclusive right to market the Jason Scott Collection.  A few months after Trendily created the M.J. Collection, she saw the Trendily Pieces at Western Heritage, for whom Malhotra had copied the pieces.  Brumbaugh called Jason Scott, concerned that he was selling furniture to her competitor in violation of their exclusivity agreement.  The Trendily Pieces were so convincing that even Jason Scott initially mistook the furniture as his own.

Like Brumbaugh, Ben Aufill, the owner of Lubbock retailer Coyote Candle—a customer of both JSC and Trendily—noticed when the Trendily Pieces entered the market.  Aufill was a close friend of Brian Forsberg, Jason Scott's brother and JSC's Texas-based delivery driver. Trendily had pitched and sold the Trendily Pieces to one of Aufill's Lubbock competitors, Hat Creek Interiors.  When Aufill discovered the Trendily Pieces at Hat Creek, he mentioned to Brian that a retailer was selling JSC knockoffs. Brian requested the name of the manufacturer, but Aufill only agreed to disclose the information on very specific terms.  Concerned that he would be considered a "snitch," Aufill told Brian, "I'll tell you but . . . if you mention my name I'll kick your ass and stop buying Jason Scott and no more Tex mex tacos at the race car shop!"  Aufill eventually made good on his promise.  After Jason Scott revealed Aufill's identity as an integral part of this lawsuit, Coyote Candle stopped purchasing JSC furniture and Brian lost his friendship with Aufill.

In May 2017, Jason Scott registered the JSC Pieces for copyright protection as "[d]ecorative sculptural designs on furniture." His counsel then sent two cease-and-desist letters to Trendily in May and June of 2017, each explaining that the Trendily Pieces infringed his copyrights in those designs. Trendily received the letters, but continued to pitch and sell the pieces to retailers and display them in its showroom until JSC filed this lawsuit in August 2017. In total, Trendily manufactured 18 Trendily Pieces (6 of each item) and sold 6 M.J. Dining Tables, 4 M.J. Office Desks, and 5 M.J. Side Boards.

JSC sued Trendily for copyright and trade dress infringement, as well as unfair competition. The district court granted summary judgment on the copyright claim and awarded JSC $19,995, the amount of Trendily's profits on the infringing sales, permanently enjoined Trendily from selling any infringing products, and ordered Trendily to destroy the remaining Trendily Pieces. However, it found a genuine issue of material fact as to whether the JSC Pieces had acquired secondary meaning, which required it to hold a bench trial to resolve the trade dress claim.

Following the bench trial, the district court concluded that the JSC Pieces had acquired secondary meaning. It reasoned that "[p]roof of copying strongly supports an inference of secondary meaning," *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2018) (citation omitted), and it was obvious that Trendily had intentionally copied the JSC Pieces to capitalize on JSC's good will. In addition, the court found several other indicators of secondary meaning, including that JSC's furniture had been on the market for many years; was featured in advertisements; was displayed at trade shows; and was recognized by both retailers and end-consumers.

The court also found that likelihood of confusion was "not a close call" because of the precise similarity between JSC and Trendily's designs.

The district court awarded JSC three years of estimated lost sales from Coyote Candle as reasonably foreseeable damages from the infringement.[1]  It explained that, because Trendily and JSC operate in the same market and share some of the same customers, Trendily's precise copying would foreseeably lead to damaged business relationships. Moreover, it was Trendily's refusal to cease and desist— even after it was sent JSC's certificates of copyright registration—that forced JSC's initiation of this lawsuit, which was the ultimate reason Aufill's identity needed to be revealed.   Thus, Aufill's necessary involvement in the infringement litigation made damages JSC suffered from that involvement compensable.[2]

The district court also awarded JSC statutory attorneys' fees.  It found that this was an "exceptional case" warranting a fee award because the copying was willful, it continued after Trendily received cease-and-desist letters, and Trendily had resisted compliance with the Court's injunction requiring destruction of the Trendily Pieces.  In total, the court awarded JSC $132,747 in damages from its lost

---

[1] The district court rejected JSC's argument that it was entitled to reasonably foreseeable damages for an inability to increase the price of its furniture beginning in 2017.  It concluded that JSC provided no evidence that the furniture market would not have supported a price increase while the Trendily Pieces were on the market.  JSC does not challenge this ruling on appeal.

[2] The district court rejected Trendily's unclean hands defense, and determined that JSC was not entitled to treble damages under 15 U.S.C. § 1117(a).  Neither party challenges these determinations on appeal.

business with Coyote Candle, $132,571.50 in reasonable attorneys' fees, and $3,904.04 in non-taxable costs.[3]  After the district court denied Trendily's motion to alter or amend the district court's judgment, Trendily appealed.

## II.

We have jurisdiction over an appeal from a final judgment under 28 U.S.C. § 1291.  In cases involving the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* (1946), "[a] trial court's finding of secondary meaning [and likelihood of confusion] may be reversed only upon a showing of clear error." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc)); *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017), *abrogated on other grounds by San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 60 F.4th 481, 500 (9th Cir. 2023).  We address legal error de novo.  *Stone Creek*, 875 F.3d at 431 ("Although we review the district court's findings and determination of no likelihood of confusion for clear error, we address legal error de novo."); *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 514 (9th Cir. 1989) ("Issues concerning the correct test to be used in evaluating trademark infringement are reviewed de novo.").[4]

---

[3] As a remedy for its unfair competition claim, JSC sought corrective labeling.  Because it had issued a permanent injunction against the manufacture of infringing pieces, the district court dismissed this claim as moot.

[4] JSC argues that the de novo standard of review is inapplicable to any aspect of this case because the district court's factual findings, finding of secondary meaning, finding of likelihood of confusion, and damages award are reviewed for clear error, and its award of attorney's fees is

Both parties argue that the standard of review for damages awarded under the Lanham Act is clear error, but we have held that monetary relief awarded under § 1117(a)(2) of the Lanham Act is reviewed for abuse of discretion. *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110, 1113 (9th Cir. 2012); *see also Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) ("We review the district court's award of damages under the Lanham Act for abuse of discretion."); *Nintendo of Am., Inc. v. Dragon Pac. Int'l.*, 40 F.3d 1007, 1010 (9th Cir. 1994) (same); *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (same).[5]   The decision to award attorneys' fees under the Lanham Act is reviewed for abuse of discretion. *See SunEarth, Inc. v. Sun Earth Solar Power Co.,*

---

reviewed for abuse of discretion.  However, Trendily is correct that the appropriateness of the legal standard is reviewed de novo.  *See Stone Creek*, 875 F.3d at 431; *Clamp*, 870 F.2d at 514.

[5] There appears some tension in our case law as to the standard of review for remedies awarded under the Lanham Act.  For instance, in *Nintendo*, we reviewed an award of defendant's profits under § 1117(a)(1) for abuse of discretion, 40 F.3d at 1010, whereas in *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015), we reviewed the same issue for clear error, *id.* at 1076.  Outside the trademark context, we have explained that, generally, "[a] monetary award following a bench trial is a finding of fact [the court] review[s] for clear error." *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 664 F.3d 282, 285 (9th Cir. 2011).  And in *Bergerco, U.S.A. v. Shipping Corp. of India, Ltd.*, 896 F.2d 1210 (9th Cir. 1990), we held that what damages were "reasonably foreseeable" at the time a contract was formed "is the sort of 'essentially factual' inquiry which should be reviewed under the clearly erroneous standard." *Id.* at 1212 (citation omitted).  However, our most recent case to review a claim under § 1117(a)(2) of the Lanham Act, *Skydive*, applied the abuse of discretion standard, 673 F.3d at 1110, 1113, and we do the same here.

*Ltd*, 839 F.3d 1179, 1181 (9th Cir. 2016) (en banc) (per curiam).

## III.

The Lanham Act protects against another's use of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin . . . of his or her goods. . . ." 15 U.S.C. § 1125(a)(1)(A). This includes a product's "trade dress," which "refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001) (internal quotation marks and citation omitted). To obtain a judgment for trade dress infringement, a plaintiff must prove: "(1) that its claimed trade dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Id.* (footnote omitted). We address each element in turn.

### A.

"Trade dress protection extends only to design features that are nonfunctional," meaning that the product feature is not "essential to the use or purpose of the article" or so long as "exclusive use of the feature would [not] put competitors at a significant, non-reputation-related disadvantage." *Id.* at 1258 (citation omitted). In their Joint Pretrial Order, the parties stipulated that "[JSC's] trade dress is nonfunctional." Facts stipulated in a pretrial order "can[not] be contested in the district court, nor can they now be contested [on appeal]." *Stranahan v. A/S Atlantica and Tinfos Papirfabrik*,

471 F.2d 369, 373 (9th Cir. 1972).  Accordingly, the first element of infringement is met.

Nevertheless, Trendily argues that the district court failed to apply the correct legal test in determining infringement because it did not consider functionality.  It contends that the stipulation was based on the assumption that the claimed trade dress was limited to "ornamental furniture designs," but that during summary judgment proceedings and in trial, JSC expanded the definition of the dress to encompass "the overall look of the JSC Pieces." Trendily argues that this expanded definition required the court to reconsider whether the trade dress was nonfunctional.

In general, "courts agree that the elements of the alleged trade dress must be clearly listed and described."  1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:3 (5th ed. 2022).  However, we have clarified that "[a] plaintiff may define its claimed trade dress as the 'overall appearance' of its product."  *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 865 (9th Cir. 2020).  Still, like other circuits,[6] we have been skeptical of such general descriptions.  Thus, "when the claimed trade dress is an 'overall appearance,' [the functionality] tests must be applied with extra care to prevent 'semantic trickery' from obscuring the functionality of the design the plaintiff seeks to monopolize."  *Id.* at 866 (citation omitted). "We have consistently held that, as a matter of law, a product's 'overall appearance' is functional, and thus

---

[6] The Second, Tenth, Third, and Sixth Circuits have found trade dress descriptions consisting exclusively of the "overall look" or "look and feel" of a product impermissibly vague.  *See Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1252 (10th Cir. 2016) (collecting cases).

unprotectable, where the product is 'nothing other than the assemblage of functional parts,' and 'even the arrangement or combination of those parts is designed to make the product more functional." *Id.* (citations omitted).

Although JSC's summary judgment motion used the words "overall look" to describe the dress of the JSC Pieces, its other filings—for example, its Complaint and the Joint Pretrial Order—provide highly specific details of the trade dress, such as the furniture's "weathered-teak" appearance, metal designs, and ornately carved legs. The district court underscored these descriptions in its findings, explaining that the Jason Scott Collection "features large-scale furniture adorned with intricate wood carvings and decorative metal."

That JSC at times used the phrase "overall look" does not mean that we should disregard the more detailed descriptions of trade dress used elsewhere—in fact, *Blumenthal* counsels that we do the opposite. *See* 963 F.3d at 865–66; *see also, e.g.*, *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1263–64 (Fed. Cir. 1995) (recognizing that a furniture line had protectable trade dress where the "furniture possesse[d] a coherent 'total image,' comprising wide slats, scooped seat boards and arms, rounded edges, notched and curved legs, and angled backrests, among other distinctive attributes"). Moreover, because these detailed design descriptions were alleged in the Complaint, Trendily was aware of the scope of the claimed trade dress before it stipulated to nonfunctionality, so there is no persuasive reason to upend that stipulation.

Because the parties stipulated to nonfunctionality, the district court relied upon that stipulation at trial, and Trendily does not provide a good reason why we should disregard that

stipulation, we accept that JSC's claimed trade dress is nonfunctional.

## B.

Because the parties also stipulated that JSC's trade dress is not inherently distinctive, JSC must prove its trade dress has secondary meaning.  *See Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 211–12 (2000) (explaining that a showing of secondary meaning is required where a product is not inherently distinctive).  Secondary meaning is "a mental recognition in buyers' and potential buyers' minds that products connected with the [trade dress] are associated with the same source."  *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 873 (9th Cir. 2002) (citation omitted); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987) ("The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source.").  Secondary meaning can be established in a variety of ways, including "direct consumer testimony; survey evidence; exclusivity, manner, and length of use of mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *P & P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953, 961 (9th Cir. 2022) (quoting *Art Attacks Ink, LLC v. MGA Ent., Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009)).  The district court did not clearly err in finding that JSC established secondary meaning.

## 1.

As we have recently reiterated, "[p]roof of copying strongly supports an inference of secondary meaning." *Id.* (quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609,

615 (9th Cir. 1989)); *see also adidas*, 890 F.3d at 755. This is because "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fid., Inc. v. High Fid. Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960).

Trendily admits that it intentionally copied the JSC Pieces, and there is ample additional evidence that it did so. Trendily's owner, Malhatra, saw the JSC designs before he copied them. Trendily and JSC share as customers two of the same largest retailers—Brumbaugh's Furniture and Hill Country Interiors. JSC's products make up 80 percent of the showroom at Brumbaugh's and 40 percent of the showroom at Hill Country. Malhotra testified that he had been to both stores, and Trendily's exclusive sales representative, Chris Sanders, testified that he knew of JSC's work within months of starting his job, including having viewed the furniture on the showroom floors. Thus, Trendily was familiar with JSC's work, and likely understood JSC's significant market share with these retailers.

Then, Malhotra, at the request of the owner of Western Heritage, a potential retail customer, ordered his factory in India to manufacture exact copies of the JSC Pieces based on photographs of them to gain Western Heritage's business. Malhotra proceeded to offer the Trendily Pieces to other retailers. In other words, "[t]here is no logical reason for the precise copying" of the JSC Pieces other than to capitalize on JSC's good will. *Audio Fid.*, 283 F.2d at 558.

Trendily cites to a handful of district court decisions to suggest that "intentional copying supports a finding of secondary meaning only where the defendant intended to confuse consumers and pass off its product as the plaintiff's," an intention which was not present here.

*Mercado Latino, Inc. v. Indio Prods.*, No. 13-01027, 2018 WL 3490752, at \*5 (C.D. Cal. July 17, 2018) (quoting *Cont'l Lab. Prods. v. Medax Int'l Inc.*, 114 F. Supp. 2d 992, 1010 (S.D. Cal. 2000).  Trendily is correct that, in some circuits, courts have imposed this "intent to confuse" requirement when considering the intentional copying factor in the secondary meaning analysis.[7]  This requirement accounts for the fact that "[c]ompetitors may intentionally copy product features for a variety of reasons"—for example, they may "choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits." *Fuddruckers*, 826 F.2d at 844–45.  However, "[t]hough some circuits have adopted . . . an intent to confuse requirement, we have not done so." *P & P Imports*, 46 F.4th at 962 (citation omitted).  Accordingly, under our precedent, Trendily's clear intent to copy nonfunctional features of JSC Pieces supports a strong inference of secondary meaning.

---

[7] *See Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995) ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his products as the plaintiff's."); *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 45 (1st Cir. 2001) (same); *Groeneveld Transport Efficiency, Inc. v. Lubecore Intern., Inc.*, 730 F.3d 494, 514 (6th Cir. 2013) (same).  By contrast, the Fourth Circuit has gone so far as to hold that copying creates a rebuttable presumption of secondary meaning, *see M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 448 (4th Cir. 1986) (explaining that "evidence of intentional, direct copying establishes a prima facie case of secondary meaning"), but our circuit has rejected that approach, *see Fuddruckers*, 826 F.2d at 844 (reaffirming that deliberate copying is relevant to secondary meaning, and "in appropriate circumstances . . . may suffice to support an inference of secondary meaning").

Trendily also argues that because copying is at times a necessary aspect of competition, it should be held liable only under the Copyright Act, not under the Lanham Act. However, nothing in the case law indicates that copyright and trademark claims are mutually exclusive. *See, e.g.*, *Wal-Mart*, 529 U.S. at 208 (involving claims for both copyright and trade dress infringement); *Art Attacks*, 581 F.3d at 1142 (same); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 796 (9th Cir. 2003) (same); *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1504 (9th Cir. 1987) (same). That copying must be proven to establish copyright infringement and may be relevant to the analysis of secondary meaning to prove trade dress infringement does not mean that the trademark and copyright laws remedy the same wrongs. *See Nintendo*, 40 F.3d at 1011 ("Congress created two separate statutory schemes to govern copyrights and trademarks; in order to effectuate the purposes of both statutes, damages may be awarded under both.").

## 2.

The district court properly considered several other factors in finding secondary meaning. For instance, the JSC Pieces were continuously manufactured and sold since 2004. Proof of substantial and continuous use of a mark in commerce for five years is *prima facie* evidence of secondary meaning. *See* 15 U.S.C. § 1052(f). The Pieces were also advertised: they were prominently displayed at trade shows; were featured in various retailers' magazines, social media, and email advertisements; and were the subject of numerous presentations Jason Scott made to customers at retail stores, which were advertised beforehand under JSC's mark and with photographs of the furniture. Retailers were trained on the "Jason Scott story" and used those brand elements in sales conversations with end consumers. Some

stores, like Fiesta Furnishings, played a video of the "Jason Scott story"—which depicted Jason Scott working with the villagers in Indonesia—on repeat in their showrooms.  In addition, Jason Scott won several awards for his furniture, including Master of the Southwest, a designation *Phoenix Home & Garden* gives to leaders in Southwest design.[8]  His designs were featured in other national and regional magazines.  This longstanding and well-known presence in the high-end furniture market supports the district court's finding of secondary meaning.  *See P & P Imports*, 46 F.4th at 961.

Moreover, the record shows that JSC's furniture was distinctive in the minds of purchasers.  Various retailers and sales representatives generally recognized JSC's furniture pieces as unique and distinctive, and specifically recognized the JSC Pieces as clearly associated with that distinctive look.  Retailers testified that end-consumers also have brand recognition of JSC products, stating that their customers "often ask for [JSC] by name" and that "[p]eople who see Jason Scott usually know what it is."  Taken together with Trendily's intentional, direct copying—as well as the highly deferential standard of review—this evidence is sufficient to indicate that the district court correctly found that JSC established that its trade dress has secondary meaning.

Trendily argues that the district court erred because JSC failed to show significant evidence that end-consumers associated JSC's trade dress with its source.  According to Trendily, the court's reliance on the *retailer's* confusion is

---

[8] *See* Phoenix Home & Garden *30th Annual Masters of the Southwest 2020 Awards*, Phoenix https://www.phoenixmag.com/event/phoenix-home-garden-30th-annual-masters-of-the-southwest-2020-awards/ (last visited Oct. 13, 2022).

irrelevant because the "chief inquiry" remains "whether in the *consumer's* mind the mark has become associated with a particular source."   *Co-Rect Prods. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332–33 (8th Cir. 1985) (emphasis added).  The district court rejected this argument, citing *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998), for the proposition that the opinions of retailers are relevant in ascertaining whether a product's look identifies its source.   *Id.* at 295 ("[W]hen, as here, the relevant market includes both distributors and ultimate purchasers, the state of mind of dealers is important in determining if secondary meaning exists.").

To be sure, in cases involving mass distribution of a product by retailers, some courts have found that testimony from dealers and wholesalers is of little value because it is unlikely to reflect the views of the consumer class.  *See, e.g.*, *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 43 n.14 (1st Cir. 2001) ("The opinions of retailers and distributors active in the scented candle field and extremely familiar with Yankee products is hardly evidence of whether the 'consuming public' forms the same association.").[9]  This stems from the principle that, in certain markets, "retailers, who know full well from whom they are buying . . . cannot serve to establish that members of the purchasing public, who come to the marketplace without such specialized knowledge, would in fact recognize the

---

[9] *See also Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 271 n.17 (2d Cir. 1968) (attaching "no particular significance" to evidence indicating that "those in the trade" have a brand association because "[i]t is the purchasing public, after all, to whom the trademark message is addressed"); *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir. 1983) (same); *Sharper Image Corp. v. Target Corp.*, 425 F. Supp. 2d 1056, 1073 (N.D. Cal. 2006) (same).

designation as an indication of origin."  *In re Semel*, 189 U.S.P.Q. 285, at \*4 (T.T.A.B. 1975).

But even if we were to disregard JSC's evidence of retailer confusion, that evidence is not necessary for JSC to establish secondary meaning.  Direct proof of end-consumer confusion is not required.  Although direct evidence of secondary meaning—such as testimony or survey evidence showing end-consumer recognition—might be the "most persuasive," *Levi Strauss*, 778 F.2d at 1358, it is "not a requirement," *Yost*, 92 F.3d at 822.  *See also* 1 McCarthy, *supra*, § 8:8.50 ("Evidence can be direct (testimony of customers or a survey) or indirect (evidence of the seller's efforts in advertising the mark throughout a wide group of prospective buyers).").  Instead, the district court relied on proof of copying and a substantial amount of indirect evidence indicating that JSC's work was recognizable by both retailers and consumers in the high-end furniture market, as well as advertisements.  *See Yost*, 92 F.3d at 822–23 (upholding a district court's reliance on advertising as the primary evidence of secondary meaning); *see also* Restatement Third, Unfair Competition § 13, comment e ("Advertising and other promotional efforts resulting in increased public exposure for the designation may also support an inference of secondary meaning.").  Finding secondary meaning on this basis was not clear error.

Moreover, while a court's reliance on retailer confusion might be misplaced in some cases, it was appropriate in this particular market, where retailers play a significant role in hand-selecting pieces for their showrooms.  "[I]f the relevant buyer class consists of *both* dealers and ultimate consumers, then the state of mind of the dealers is obviously important." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:46 (5th ed. 2022).  For instance, in

*Thomas & Betts*, the Seventh Circuit held that testimony of store personnel was probative of secondary meaning because in the market at issue—cable ties for electrical wires—the plaintiff sold its products primarily through specialized distributors, and therefore "the state of mind of [the] dealers [was] important."  138 F.3d at 294–95.

So too here, the high-end furniture market involves specialized distributors.  High-end furniture sellers attend trade shows and select certain furniture pieces for sale in their stores.  These pieces are often expensive investments that take up significant real estate in a showroom, and only a small number of them are sold each year.  As a result, retailers in the high-end furniture market functionally operate as consumers: They must be selective when they purchase pieces for their showrooms, as they have a substantial interest in ensuring that the products they stock will sell.  Thus, furniture manufacturers must develop a brand recognizable to dealers in addition to the end-consumer to get their pieces displayed and eventually purchased.

Relying on *Wal-Mart*'s discussion of inherent distinctiveness, Trendily alternatively argues that product design acquires secondary meaning only rarely or not at all. 529 U.S. at 212–14.  However, we think Trendily misconstrues *Wal-Mart*'s primary holding.  Trade dress is protectable only if it is distinctive.  *Id.* at 210.  A mark can be distinctive in one of two ways—either the mark is "inherently distinctive" because it intrinsically identifies a source, or the mark has "acquired distinctiveness, even if it is not inherently distinctive, [because] it has developed secondary meaning." *Id.* at 210–11 (citations omitted). *Wal-Mart* stands for the proposition that product-design trade dress, unlike product-packaging trade dress, cannot be

*inherently* distinctive because product designs are "intended not to identify the source [of the product], but to render the product itself more useful or appealing." *Id.* at 213.  But the Court did not conclude that product designs can never be distinctive.  *See id.* at 211, 216.  Rather, a design is still protectable if it acquires secondary meaning. *Id.*  Thus, *Wal-Mart* is only relevant to the extent it indicates whether JSC was required to show secondary meaning,[10] which it did.

## C.

The district court did not err in finding that there was a likelihood of confusion between the JSC Pieces and the Trendily Pieces.  To demonstrate a likelihood of confusion, JSC had to show that "a reasonably prudent consumer would be confused about the source of the goods bearing the marks." *adidas*, 890 F.3d at 755 (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)).  We turn to the *Sleekcraft* factors to evaluate whether a product creates a likelihood of confusion, assessing: (1) strength of mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).  However, "[t]his list is not exhaustive," and "[o]ther variables may come into play depending on the particular facts presented." *Id.* at 348 n.11;

---

[10] Because the parties stipulated that JSC's trade dress is not inherently distinctive, whether JSC's trade dress constitutes product design or product packaging is irrelevant, *see Wal-Mart*, 529 U.S. at 214–215, as JSC is required to prove secondary meaning to gain trade dress protection regardless. *See id.* at 211–12.

*see also Fortune Dynamic v. Victoria's Secret*, 618 F.3d 1025, 1030 (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts." (citation omitted)).

The similarity factor is "of considerable importance to the likelihood of confusion analysis, given that 'the greater the similarity between the two marks at issue, the greater the likelihood of confusion.'" *adidas*, 890 F.3d at 755 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000)).   As the district court found, Trendily "admittedly, intentionally, and precisely copied the JSC Pieces in look, color, size, and detail."  The photographs of the pieces depict a nearly exact match between the two lines of products. *See* Appendix A.  Several witnesses—all of whom were professionals in the high-end furniture business—could not distinguish the Trendily Pieces from the JSC Pieces, indicating that ordinary consumers would also face the same difficulty.   Although retailer confusion is arguably of less significance to the secondary meaning analysis because professional expertise makes it more likely that a brand will have meaning to a retailer than a consumer, the opposite should be true for likelihood of confusion—if a seasoned retailer cannot tell the difference between the original and the knockoff, it is likely that an end-consumer would not be able to do so either.

In addition, the proximity of the goods is high here. "There can be little doubt that the [pieces of furniture] in question here are similar goods, and that, if the [furniture] were sold under the same mark, the public would reasonably think they came from the same source." *adidas*, 890 F.3d at 755–56.   And the district court correctly highlighted evidence of significant overlap in the marketing channels, as

Trendily and JSC both sell pieces in the Texas high-end furniture market. Because "the products and marketing channels of the parties were nearly identical," *Fuddruckers*, 826 F.2d at 846, the district court did not err in its likelihood of confusion finding.

Trendily contends that the district court erred by failing to consider whether there was evidence of actual consumer confusion. Trendily asserts that, because copying is a natural part of a competitive market, evidence of actual consumer confusion is required, and evidence of retailer confusion is insufficient. However, "courts almost unanimously presume a likelihood of confusion based on a showing of intentional copying." *Id.* at 846 (citing *M. Kramer Mfg.*, 783 F.2d at 448 n.24); *see also* Restatement Third, Unfair Competition § 22, comment c ("[I]f there is proof of intentional copying with no alternative explanation, an intent to benefit from the other's good will through confusion may be inferred."). And the copying in this case is so blatant that it is hard to imagine any other reason for it than Trendily's desire to take advantage of JSC's good will. Moreover, in *Sleekcraft* itself, the court considered evidence of "confusion . . . in the trade"—like the confusion the furniture retailers experienced here—as evidence of actual confusion. 599 F.2d at 352. Plus, "the failure to prove instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007) (citation omitted).

Trendily also argues that the marketing channels factor weighs in its favor because the evidence demonstrates that retailers maintained their exclusivity agreements, and

Trendily's Pieces were marketed only to stores that did not carry the JSC line.  There are three problems with this reasoning.  First, Trendily stipulated before trial that "[t]he Parties are direct competitors, selling the same types of goods through the same marketing channels, to the same types of consumers."  Second, the record contains evidence that Trendily pitched its knockoffs to several of JSC's exclusive retailers, including Runyon's, Calamity Jane's, and Hill Country.

Third, even if Trendily had not agreed to the stipulation and there was no evidence Trendily pitched to JSC retailers in the record, Trendily oversimplifies the dynamics of the market.  JSC's exclusivity agreements exist to ensure that its retailers will not have to compete against another retailer in the same area for buyers of JSC furniture.  If the Trendily Pieces are available at other competitors in a given area, the JSC exclusive retailer would no longer be the sole supplier, which was Sally Brumbaugh's concern.  Thus, because Trendily and JSC share geographic proximity and offer the same product, they are in the same marketing channel.

In any event, "only a subset of the *Sleekcraft* factors are needed to reach a conclusion as to whether there is a likelihood of confusion."  *GoTo.com*, 202 F.3d at 1206. Accordingly, the district court correctly held that JSC established all three elements required to demonstrate trade dress infringement.

## IV.

We now turn to remedies.  Trendily challenges the district court's decision to award reasonably foreseeable damages to JSC based on its changed relationship with retailer Coyote Candle.  We hold that the district court did not abuse its discretion in fashioning this award.

Under the Lanham Act, the district court, "in its discretion" and "subject to the principles of equity," may award the plaintiff "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action" for a defendant's violation of a trademark right.  15 U.S.C. § 1117(a).  In awarding damages under § 1117(a)(2), as was the case here,[11] "[t]he trier of fact must distinguish between proof of the *fact* of damages and the *amount* of damages because a mark holder is held to a lower standard in proving the exact amount of actual damages."  *Skydive*, 673 F.3d at 1112.

## A.

We assess trademark damages "in the same manner as tort damages: the reasonably foreseeable harms caused by the wrong."  *Id.* (citing *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1222 (9th Cir. 2010)); *see also Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1563–64 (11th Cir. 1986); *Aladdin Mfg. Co. v. Mantle Lamp Co. of Am.*, 116

---

[11] In its briefing, Trendily appears to equate "defendant's profits" under § 1117(a)(1) with "any damages sustained by the plaintiff" under § 1117(a)(2).  However, the two forms of damages are distinct.  "Defendant's profits" are a form of disgorgement and are typically calculated based on the infringer's overall gross revenue from the infringement less the infringer's expenses.  *See Fifty-Six Hope Road Music*, 778 F.3d at 1075.  By contrast, "any damages sustained by the plaintiff" include compensatory damages arising from any "reasonably foreseeable harms" caused by the wrong.  *Skydive*, 673 F.3d at 1112 (citation omitted).  The damages arising from Coyote Candle's lost business are necessarily not "defendant's profits" because they are measured by JSC's projected revenue from Coyote Candle, not Trendily's earned revenue from the infringement.  The district court properly categorized the award as other "damages sustained by the plaintiff" under § 1117(a)(2).

F.2d 708, 716 (7th Cir. 1941). "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated on other grounds by SunEarth*, 839 F.3d at 1180.

Few circuits have addressed the precise meaning of foreseeability in the trademark context, but those that have tend to award damages even for future or speculative harm. *See Skydive*, 673 F.3d at 1112–13; *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1125–26 (5th Cir. 1991), *aff'd on other grounds,* 505 U.S. 763 (1992); *Broan Mfg. Co., Inc. v. Assoc. Distributors, Inc.*, 923 F.2d 1232, 1236 (6th Cir. 1991); *cf. Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987). For instance, in *Broan*, the Sixth Circuit held that uncertainty in a chain of causation "is not fatal" to awarding damages. 923 F.2d at 1237. There, the trademark holder sought to recover lost business it claimed it would have earned from future sales but for the infringement. *Id.* The Sixth Circuit explained that, even though there was "[s]ome uncertainty regarding what might have happened in the absence of a copying scheme," one could make a "reasonable inference" that the infringement had a "tendency to injure [Broan's] business," and therefore damages were warranted. *Id.* at 1237, 1238.

Similarly, in *Taco Cabana*, the Fifth Circuit affirmed a damages award based on the "headstart" theory, which posits that a trade dress holder should be compensated for losses caused by the infringer's use of the trade dress in the market that was the trade dress holder's next logical area of expansion. 932 F.2d at 1126. In *Taco Cabana*, infringer Two Pesos used Taco Cabana's signature restaurant design to open locations in the Houston market, "one of the most

affluent Mexican food markets in the country." *Id.* The court held that Two Pesos' infringement foreclosed Taco Cabana from expanding into this lucrative market, and therefore Taco Cabana was entitled to compensation for this lost opportunity. *Id.* at 1226–27. Thus, it appears that that there is some flexibility in assessing reasonably foreseeable damages under the Lanham Act. After all, § 1117(a)(2) permits the district court to award "*any* damages sustained by the plaintiff." 15 U.S.C. § 1117(a)(2) (emphasis added).

Damaged business relationships are a reasonably foreseeable consequence of trademark infringement. Here, Aufill disclosed Trendily's identity to Brian Forsberg on the condition that his own identity would not be revealed to avoid harming his own business relationships in the high-end furniture market. Earning a reputation as a "snitch" could reasonably have harmed Aufill's ability to work with certain suppliers. Moreover, it was Trendily's intransigence that ultimately pushed JSC to reveal Aufill's identity. Trendily ignored JSC's cease-and-desist letters, which forced JSC to file suit. Aufill was not disclosed as the source until it was necessitated by the litigation—his identity was relevant as to how he recognized the JSC furniture knock-offs, the discovery of the infringement, and the likelihood of confusion even seasoned retailers had as to the products' source. Thus, JSC was required to reveal Aufill's identity as an integral part of his claim against Trendily. And, since the litigation, JSC has lost all of its Coyote Candle business. JSC had rarely lost customers over the course of its history, which increases the likelihood that the infringement was the cause of the lost business.

Trendily argues that the infringement was not the direct cause of JSC losing Coyote Candle's business. While the infringement may have been a "but for" cause of Aufill's

decision to stop doing business with JSC, Trendily maintains that his actions were not foreseeable because JSC made an independent decision to reveal Aufill's identity. Further, Aufill created the ultimatum because he "didn't want to be a snitch"—JSC did not lose Coyote Candle's business for a reason more traditionally associated with infringement, such as Trendily offering lower prices for its copycat pieces. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 194 (1st Cir. 2012) ("The most straightforward theory of damages would be that the infringement had diverted specific sales away from [the trademark holder].").

However, the law does not appear to confine the nature of compensable loss as narrowly as Trendily suggests. Here, Trendily infringed; refused to cease doing so short of litigation; litigation ensued and Aufill's actions and involvement were both relevant and necessary to prove JSC's claim. An "infringer-tortfeasor is liable for all injuries caused to the plaintiff by the wrongful act." *Lindy Pen*, 982 F.2d at 1407 (citation omitted). To assess the appropriate scope of liability resulting from a wrong, tort principles "require[] consideration, at an appropriate level of generality, of: (a) the risks that made the actor's conduct tortious, and (b) whether the harm for which recovery is sought was the result of any of those risks." Restatement of Torts (Third): Phys. & Emot. Harm § 29 (2010), comment d. Trendily's actions poisoned the business relationship between JSC and Coyote Candle, a risk within the scope of Trendily's infringement.

Additionally, § 1117(a) "confers a wide scope of discretion upon the district judge in fashioning a remedy." *Skydive*, 673 F.3d at 1113 (quoting *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968)). "[T]he preferred approach allows the district court

in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997).  This is because "it is essential that trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1275 (9th Cir. 1982).  For instance, we have held that a court may grant "a just monetary award" under § 1117 even where a plaintiff cannot prove actual damages, "so long as it constitutes compensation for the plaintiff's losses or the defendant's unjust enrichment and is not simply a penalty for the defendant's conduct." *Southland Sod*, 108 F.3d at 1146 (internal quotation marks and citation omitted); *see also* Restatement (Third) of Unfair Competition § 36, comment h (1995) (a defendant may be held liable "even for unanticipated consequences of its wrongful conduct").  And while a court may not impose a penalty, "[w]hen the defendant intentionally seeks to confuse or deceive," as was the case here, "the court may accept less certain proof of loss in order to discourage similar behavior in the future." Restatement (Third) Unfair Competition § 36, comment j (1995).  Given this broad discretion, and the plausible causal relationship between Trendily's actions and the loss of Coyote Candle's business, the district court did not abuse its wide discretion when it found that JSC suffered a compensable harm.[12] *See United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (holding that a district court

---

[12] The district court—by suggestion of the parties—declined to award defendant's profits for JSC's trade dress claim because it had already awarded defendant's profits for its copyright claim at the summary judgment phase.  Neither party challenges this determination on appeal.

abuses its discretion only when its ruling is "illogical, implausible, or without support in inferences that may be drawn from facts in the record").

## B.

Once the court establishes that damages are warranted, "there need only be substantial evidence to permit the [trier of fact] to draw *reasonable inferences* and make *a fair and reasonable assessment*" as to the amount of damages. *Skydive*, 673 F.3d at 1112 (citing *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 342 (9th Cir. 2010)). Trendily argues that the $132,747 award of lost annual profits from Coyote Candle over a period of three years extends beyond discretion because it amounts to six times the $19,995 in profits JSC was awarded for its copyright claim.

The district court did not abuse its discretion in awarding this damages amount. The copyright damages were assessed based on Trendily's *retrospective* gross profits from the infringement—the amount of money Trendily made off the infringing pieces. The trade dress damages were assessed based on JSC's *prospective* lost profits—the amount of money JSC would have made if it kept Coyote Candle's business. Because of these fundamentally different measures, Trendily's argument that the lost business from Coyote Candle is disproportionately larger is inapposite. The district court found that JSC's evidence "satisfactorily demonstrates" it was entitled to that amount, and Trendily points to no other evidence to show why the award was unreasonable. Because we "accept crude measures of damages in cases of intentional infringement," *id.* at 1113, there is no sign that the district court erred in authorizing this damages amount.

## V.

Trendily argues that the district court erred by awarding attorneys' fees, while JSC contends those attorneys' fees were proper, and that further fees should be awarded on appeal.  We address each fee award in turn.

### A.

Section 1117(a) of the Lanham Act permits a plaintiff to recover attorneys' fees "in exceptional cases."  15 U.S.C. § 1117(a).  A court determines if a case is exceptional by considering the "totality of the circumstances" and evaluating whether the case is "one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and facts of the case) or the unreasonable manner in which the case was litigated" based on a preponderance of the evidence.  *SunEarth*, 839 F.3d at 1180.

Trendily intentionally and precisely copied JSC's designs, ignored JSC's cease and desist letters, and resisted compliance with the court's injunction.  Trendily told other retailers that it had copied and intended to continue copying the JSC Pieces, such that retailers thought the suit was necessary to protect their investment in JSC products.  The district court did not abuse its discretion in concluding that such willful and brazen infringement, paired with the strength of JSC's trade dress claim, constitutes an exceptional case.  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216–17 (9th Cir. 2003) (collecting cases).[13]

---

[13] In 2016, *SunEarth* altered the test for determining what constitutes an "exceptional case" within the meaning of the Lanham Act.  Previously, the Ninth Circuit's test required the plaintiff to show that a defendant

Trendily circularly argues that fees are not warranted because the district court's findings on secondary meaning and likelihood of confusion are legally erroneous. However, as explained, the district court correctly applied the relevant legal rules. Trendily also argues that the district court inappropriately considered Trendily's decision not to comply with the injunction because its decision to do so was reasonable. But regardless of whether Trendily's actions were reasonable, they were an attempt to circumvent the full force of the injunction—an action that weighs in favor of awarding attorneys' fees for infringement. *Cf. Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1026–27 (9th Cir. 1985) (affirming the award of attorney's fees in a copyright action where there was substantial evidence of deliberate infringement, including continued infringement in violation of an injunction). Accordingly, the district court correctly awarded fees in this case.

## B.

We also award JSC attorneys' fees on appeal. "Generally, a party that is entitled to an award of attorneys' fees in the district court is also entitled to an award of attorneys' fees on appeal." *Voice v. Stormans Inc.*, 757 F.3d 1015, 1016 (9th Cir. 2014) (citations omitted). In cases

---

engaged in "malicious, fraudulent, deliberate or willful infringement." *Lindy Pen*, 839 F.3d at 1409. In *SunEarth*, the Ninth Circuit broadened the test to consider the "totality of the circumstances" using a "nonexclusive list" of factors, including "frivolousness, motivation, objective unreasonableness (both in factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1180–81 (internal quotation marks and citations omitted). Because the *SunEarth* test is less stringent than the previous "willful infringement" standard, it stands to reason that this case of willful infringement would satisfy the *SunEarth* test.

involving an award of statutory fees, like those under § 1117(a), "federal courts have uniformly held that attorneys are entitled to be compensated for the time reasonably spent establishing their right to the fee." *Id.* at 1016–17 (citing *Orange Blossom P'Ship v. S. Cal. Sunbelt Devs., Inc.*, 608 F.3d 456, 462–65 (9th Cir. 2010)). And the Ninth Circuit has awarded attorneys' fees on appeal in an "exceptional case" involving willful trademark infringement. *Yost*, 92 F.3d at 825. Under this clear precedent, attorneys' fees on appeal are appropriate here.

## VI.

For the reasons given, we affirm the district court's judgment against Trendily for trademark infringement, its award of damages, and its award of attorneys' fees. We refer determination of the appropriate amount of appellate attorneys' fees to the Appellate Commissioner, who shall conduct whatever proceedings she deems appropriate, and who shall have authority to enter an order awarding fees. *See* 9th Cir. R. 39-1.6, 1.9.

**AFFIRMED.**

# APPENDIX A

## <u>Tables</u>



**Figure 1:**  JSC's Sacred Heart Table



**Figure 2:**  Trendily's M.J. Dining Table

## **Desks**



**Figure 3:**  JSC's Iron Star Desk



**Figure 4:**  Trendily's M.J. Desk

## <u>Sideboards</u>

 

**Figure 5:**  JSC's Borgota Buffet



**Figure 6:**  Trendily's M.J. Sideboard